833 F.2d 1334
 51 Fair Empl.Prac.Cas. 151,
45 Empl. Prac. Dec. P 37,605
Linda ELDREDGE, on behalf of herself and on behalf of all
others similarly situated, Plaintiffs-Appellants,
v.
CARPENTERS 46 NORTHERN CALIFORNIA COUNTIES JOINT
APPRENTICESHIP AND TRAINING COMMITTEE, Defendant-Appellee.
 No. 85-2846.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 9, 1987.
Decided Dec. 9, 1987.
 
 Alberta M. Blumin, Oakland, Cal., for plaintiffs-appellants.
 Wesley Sizoo, Moore, Sizoo & Cantwell, Oakland, Cal., for defendant-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before FLETCHER, REINHARDT and KOZINSKI, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Eldredge filed a class action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-2, alleging that the procedures used by the Carpenters 46 Northern California Counties Joint Apprenticeship and Training Committee (JATC) to admit applicants into its apprenticeship program have an impermissible adverse impact on women. On cross-motions for summary judgment, the district court entered judgment in favor of the JATC because it found that Eldredge was attempting to hold the JATC liable for the discriminatory acts of third parties, rather than for its own conduct. Eldredge appeals from the grant of the JATC's motion and the implicit denial of her own motion for summary judgment. We reverse and remand.
 
 BACKGROUND
 
 2
 The JATC is a joint labor-management committee, established pursuant to a trust agreement, that administers the carpentry apprenticeship program in Northern California. As we previously noted, "[t]he trust fund agreement grants full authority to JATC to structure the apprenticeship program and to select the apprentices." Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship and Training Comm., 662 F.2d 534, 538 (9th Cir.1981), cert. denied, 459 U.S. 917, 103 S.Ct. 231, 74 L.Ed.2d 183 (1982) (Eldredge II ). To be admitted into the apprenticeship program, an applicant must (1) be at least seventeen years old; (2) have a high school diploma or G.E.D. equivalent; (3) have his or her name placed on a "new applicant referral list"; and (4) satisfy a first-job requirement by obtaining employment with a union contractor. Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship and Training Comm., 440 F.Supp. 506, 511 (N.D.Cal.1977), rev'd, 662 F.2d 534 (9th Cir.1982) (Eldredge I ).
 
 
 3
 It is the implementation of the first-job requirement that is at issue in this case. There are two ways in which applicants may obtain their first jobs. First, if a contractor requests the union to provide a beginning apprentice and does not name a particular individual, applicants are dispatched in numerical order from the new applicant referral list. Very few applicants obtain work through the referral system; indeed, it is nearly futile for an applicant to depend on this method. Eldredge I, 440 F.Supp. at 512. Second, an applicant may find an employer willing to provide her with a job and to request her by name. This method, which is known as the "hunting license" system, is the one through which the vast majority of indentured apprentices obtain their first jobs and gain admittance into the apprenticeship program. For the years 1976 through 1984, 20.9% of female applicants and 38.8% of male applicants became indentured apprentices. The female admission rate was thus about 54% of the male admission rate.
 
 
 4
 In 1977, Linda Eldredge, on behalf of all unsuccessful female apprenticeship applicants, filed an amended complaint alleging that the JATC's use of the "hunting license" system has a disparate impact on women applicants and as such violates section 703(d) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-2(d).[1] In 1979, the district court dismissed the case under Federal Rule of Civil Procedure 19 for failure to join the 4,500 potential employers of apprentices. Eldredge I, 440 F.Supp. at 519-24. This court reversed, holding that the employers were not necessary parties under Rule 19(a) and thus could not be indispensable parties under Rule 19(b). Eldredge II, 662 F.2d at 536-38. On remand, the plaintiff class was certified, and both sides moved for summary judgment. The district court, finding the JATC to be the equivalent of an employment agency for the purpose of Title VII and finding the focus of Eldredge's complaint to be discrimination by employers rather than by the JATC, granted the JATC's motion. The court concluded that "[a]s plaintiff has established no basis on which to hold the JATC liable under Title VII for the alleged unlawful conduct of these employers, defendant's motion for summary judgment must be granted." Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship & Training Comm., No. C75-2062-JPV at 5 (N.D.Cal. Oct. 24, 1985) (order) (Eldredge III ). Eldredge timely filed notice of appeal from the district court's order.
 
 STANDARD OF REVIEW
 
 5
 Both the grant of summary judgment to the JATC and the denial of Eldredge's summary judgment motion are reviewed de novo. Idaho v. Hodel, 814 F.2d 1288, 1292 (9th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 159, 98 L.Ed.2d 114 (1987). "Viewing all the evidence in the record in the light most favorable to the non-moving party, we must determine whether there is a genuine issue as to any material fact and, if not, whether the substantive law was correctly applied." Id.; Fed.R.Civ.P. 56(c). The entry of summary judgment is mandatory
 
 
 6
 after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.
 
 
 7
 Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).
 
 DISCUSSION
 The JATC's Motion for Summary Judgment
 
 8
 To assess the propriety of the district court's grant of summary judgment to the JATC, we must determine whether the court correctly found that the JATC could not be in violation of Title VII because it did not make the allegedly discriminatory hiring decisions. To establish a prima facie case of discrimination in a disparate impact case, "a plaintiff need only show that the facially neutral standards in question select applicants for hire [or, in this case, for admission to an apprenticeship program] in a significantly discriminatory pattern." Dothard v. Rawlinson, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726-27, 53 L.Ed.2d 786 (1977). The JATC's requirement that applicants secure employment, which is implemented primarily through the "hunting license" system, is a "facially neutral standard" used to determine who will be admitted into the apprenticeship program. If the requirement as implemented has a significantly discriminatory impact on women applicants, Eldredge clearly has the basis for a claim under Title VII.
 
 
 9
 The district court held, in effect, that use of a facially neutral requirement is permissible even though it is discriminatory so long as it is a third party that is doing the discriminating. The district court reached this result by recharacterizing Eldredge's complaint as an attempt to hold the JATC liable for the discriminatory hiring practices of employers in the construction industry, in fact, Eldredge claims that the JATC is liable for its own implementation of the first-job requirement in a fashion that adversely affects women.[2] All that a disparate impact plaintiff must show, in the first instance, is the existence of a practice that serves to exclude a protected class in disproportionate numbers. The JATC does not contend that some factor other than the "hunting license" system accounts for women's lower admission rate into its program.[3] It cannot avoid liability for the effects of its own admission procedures by pointing to the discriminatory practices of those to whom it has delegated the power to select apprentices.
 
 
 10
 The district court relied on Kaplowitz v. University of Chicago, 387 F.Supp. 42 (N.D.Ill.1974), which held that a law school was not required to police the discriminatory practices of employers who used its placement facilities. The Kaplowitz court found that the law school was an employment agency for the purposes of Title VII, id at 46; see 42 U.S.C. Sec. 2000-2(b) (unlawful employment agency practices), but agreed with an EEOC opinion letter stating that the only obligation of an employment agency is to refer potential employees in a nondiscriminatory manner.[4] The JATC, however, does not stand in the same position as an employment agency. It is not simply an intermediary between applicant and employer. Rather, it is the JATC that possesses the full authority to select the carpentry apprentices for Northern California. Eldredge II, 662 F.2d at 538. The district court failed to recognize that the employers are merely delegates of the JATC's power to determine which applicants will be admitted into the program. Because the JATC may, under the trust agreement, select apprentices in any way it deems appropriate, it violates Title VII if it uses procedures that unjustifiably discriminate against a class of people protected under Title VII.
 
 
 11
 In holding that the JATC could not be liable for the discriminatory effects of the "hunting license" system, the district court incorrectly applied the substantive law. Accordingly, we reverse the district court's grant of summary judgment to the JATC.
 
 Eldredge's Motion for Summary Judgment
 
 12
 We now turn to Eldredge's claim that the district court erred in not granting her cross-motion for summary judgment on the issue of liability.
 
 
 13
 At the outset, in a disparate impact case under Title VII, the plaintiff must make out a prima facie case. She carries the burden of demonstrating that the challenged employment practices produce a significantly discriminatory selection pattern. Dothard, 433 at 329, 97 S.Ct. at 2726; Atonio v. Wards Cove Packing Co., 827 F.2d 439, 442 (9th Cir.1987). A showing of discriminatory intent is not required in a disparate impact case, International Bhd. of Teamsters v. United States, 431 U.S. 324, 349, 97 S.Ct. 1843, 1861, 52 L.Ed.2d 396 (1977); Bonilla v. Oakland Scavenger Co., 697 F.2d 1297, 1303 (9th Cir.1982), cert. denied, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 838 (1984), and the Title VII plaintiff "need not prove discrimination with scientific certainty; rather his or her burden is to prove discrimination by a preponderance of the evidence." Bazemore v. Friday, --- U.S. ----, 106 S.Ct. 3000, 3009, 92 L.Ed.2d 315 (1986). An uncontroverted showing of significant statistical disparities may be sufficient to establish the plaintiff's prima facie case. New York Transit Auth. v. Beazer, 440 U.S. 568, 584, 99 S.Ct. 1355, 1365, 59 L.Ed.2d 587 (1979); Contreras v. City of Los Angeles, 656 F.2d 1267, 1275 (9th Cir.1981), cert. denied, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982).
 
 
 14
 If the plaintiff establishes a prima facie case of discriminatory impact, the burden then shifts to the defendant to refute the statistical data to show that no disparity exists or to prove that its practice is a business necessity. Atonio, 827 F.2d at 442.[5] An employer may demonstrate business necessity by proving that its selection criteria are essential to insure job safety or efficiency or are correlated with success on the job. "Job relatedness is a means of proving 'business necessity' when the purpose of a criterion is to predict the capacity of particular individuals to perform a job successfully." Id. "[T]he employer must demonstrate the 'manifest relationship' between the challenged practice and job performance." Id. (quoting Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971)). "Precisely what the employer must prove will vary with the unique factors of different job settings, but '[t]he touchstone is business necessity.' " Id. (quoting Griggs, 401 U.S. at 431, 91 S.Ct. at 853). If the defendant carries its burden, the plaintiff may yet prevail by proving the availability of an effective nondiscriminatory alternative. Contreras, 656 F.2d at 1275. In short, Eldredge is entitled to summary judgment on the issue of JATC's liability if there are no disputed facts as to the material issues: (1) whether the "hunting license" system causes significant statistical disparities between the percentage of female applicants and the percentage of male applicants admitted into the apprenticeship program; (2) whether use of the "hunting license" system is a business necessity; and (3) if it is a business necessity, whether nondiscriminatory alternatives exist.
 
 
 15
 To the extent that women and men are admitted into the apprenticeship program at different rates, it is not contested that the differential results from use of the "hunting license" system and not from some other element of the admission process. The JATC attempts to explain why the "hunting license" system has this effect but does not dispute the existence of the effect.[6]
 
 
 16
 The data on admission rates for qualified men and women into the apprenticeship program, which were supplied by the JATC, demonstrate a substantial disparity between the sexes. Aggregated over a nine-year period, women's admission rate as a percentage of women applicants was approximately fifty-four percent of men's admission rate. In absolute numbers over a nine year period 21,066 men but only 657 women were indentured.[7] The guidelines established by the Equal Employment Opportunity Commission provide that "a selection rate that 'is less than [80 percent] of the rate for the group with the highest rate will generally be regarded ... as evidence of adverse impact.' " Connecticut v. Teal, 457 U.S. 440, 443 n. 4, 102 S.Ct. 2525, 2529 n. 4, 73 L.Ed.2d 130 (1982) (quoting 29 C.F.R. Sec. 1607.4D (1981)); see also Abermarle Paper Co. v. Moody, 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975) (stating that EEOC guidelines, as interpretations of Title VII by the enforcing agency, are entitled to "great deference"); Thomas v. Metroflight, Inc., 814 F.2d 1506, 1511 n. 4 (10th Cir.1987) (using the EEOC's 80% rule as an index of "substantial disparity").
 
 
 17
 Both Eldredge and the JATC employed statisticians to evaluate the "significance" of the male/female differential; that is, to test the probability that the disparity resulted from chance rather than from the challenged admission procedures. Although the statisticians disagreed as to how the data should be broken down and employed different statistical models in their analysis, both found that the disparity was statistically significant.[8] Because Eldredge demonstrated that use of the "hunting license" system resulted in a substantial and statistically significant disparity between male and female indenture rates, she established her prima facie case of discrimination.
 
 
 18
 The burden shifted to the JATC to prove that the "hunting license" system is a business necessity. To establish business necessity, the JATC claims that their system is both job-related and necessary to the efficient operation of the apprenticeship program.
 
 
 19
 Even if we assume that requiring apprentices to have a job in the industry is a business necessity (because the classroom training is more effective when combined with hands-on experience),[9] the JATC has neither argued nor produced evidence that use of the "hunting license" system to satisfy the first-job requirement is itself a business necessity. Indeed, such would be the case only if one's ability to find a job were an accurate measure of one's ability to learn the carpentry trade. See Contreras, 656 F.2d at 1271 (To be job-related, a screening device must "actually measure[ ] skills, knowledge, or ability required for successful performance of the job."). Obviously it is not. Nor has the JATC argued that the "hunting license" system is the only way in which the first job requirement can be satisfied. Such an argument would be futile given that an alternate method--numerical referral from the new applicant referral list--is already in place.[10] See supra t 1340. Furthermore, requiring apprentice applicants to find their own jobs or allowing employers to select their own apprentices is at odds with the hiring-hall system that, under the Carpenters Master Agreement, employers must use to fill most of their non-apprentice hiring needs. Thus, the JATC has not demonstrated business necessity with a showing of apprenticeship-relatedness in the sense of showing that it is essential to hire apprentices in a different manner than journeymen are hired.
 
 
 20
 In support of its "business necessity" defense, the JATC also submitted the declaration of JATC officer Gordon Littman. Littman convincingly explained why the JATC cannot and should not accept all those who apply into the apprenticeship program--it lacks the resources to train them and there are not sufficient apprenticeship positions in the industry to accommodate all applicants. The district court found, based on Littman's declaration, that the "first job" requirement was based on a "legitimate business reason." Eldredge III, No. C75-0262-J.P.V. at 4. Apart from the fact that a "legitimate business reason" is not the same thing as a "business necessity,"[11] the district court (and Littman) failed to recognize that Eldredge is not seeking to have all applicants accepted into the program and that alternatives to the "hunting license" system are equally capable of appropriately limiting the number of indentured apprentices.[12] In short, the JATC produced no evidence that the "hunting license" system is a business necessity that must be employed to limit the number of carpentry apprentices.
 
 
 21
 Because a showing that the "hunting license" system is a business necessity is an essential element of the JATC's case on which it would bear the burden of proof at trial, the JATC's failure to adduce proof on this issue entitles Eldredge to judgment against the JATC on the issue of liability--the JATC is violating Title VII as a matter of law. Celotex, 106 S.Ct. at 2553; cf. Martinez v. United States, 669 F.2d 568, 570 (9th Cir.1981) ("Under proper circumstances, an appellate court may order the district court to enter summary judgment for the nonmoving party.").
 
 CONCLUSION
 
 22
 The district court's grant of summary judgment to the JATC is REVERSED. The case is REMANDED for entry of summary judgment for the plaintiff class on the issue of Title VII liability based on the JATC's use of the "hunting license" system and for trial to determine the appropriate remedy.
 
 
 
 [1]
 42 U.S.C. Sec. 2000e-2(d) provides:
 It shall be unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.
 
 
 [2]
 That the employers' practices may be discriminatory lends support to the plaintiffs' claim that the "hunting license" method of meeting the first-job requirement is discriminatory
 
 
 [3]
 The JATC's experts did attempt to show that factors other than gender discrimination by employers accounted for the fact that fewer women than men succeeded at securing employment. See infra note 6
 
 
 [4]
 The Kaplowitz court's holding was based primarily on its finding that the relief sought, which would have required the law school to determine whether particular law firms were guilty of discrimination, would bypass the Title VII statutory procedures. The court reasoned that in the course of reviewing a grant of injunctive relief to the plaintiffs it
 would eventually have to make a determination as to whether a prospective employer was in violation of Title VII, for only then would the Law School, as an operator of an employment agency, be in violation of Title VII.... But it is equally clear that courts shall not hear Title VII suits before they are heard by the EEOC. This procedure would frustrate the conciliation efforts the statute is designed to initiate.
 
 
 [387]
 F.Supp. at 49. In this case, the JATC would not be required to determine whether the employers discriminate and no court will ever be asked to hold that the employers violate Title VII in the absence of prior EEOC consideration of the allegation. This is because, as discussed above, the issue is the impact of the "hunting license" system and whether it is a business necessity
 
 
 [5]
 The shift of the burden of persuasion to the defendant distinguishes disparate impact cases from disparate treatment cases, in which the burden at all times remains on the plaintiff. See Atonio v. Wards Cove Packing Co., 827 F.2d 439, 442 (9th Cir.1987)
 
 
 [6]
 The JATC's experts conducted a survey of people in the carpentry trade, comparing men and women, to determine whether the difference in indenture rates resulted from discrimination. The decision to study the group of people who were successful at breaking into the trade is very odd given that the group at issue in this lawsuit consists of those who were excluded. For example, the fact that among those employed "86% of males and 88% of females found their first job within three months" is immaterial if a far greater percentage of women than men never found a job
 Furthermore, the JATC's experts apparently were directed to conduct their survey in conformity with the JATC's theory of the case, according to which Eldredge was attempting to hold the JATC liable for discrimination by employers. The JATC's study was directed at proving that contractors do not discriminate against women in their hiring practices. The experts thought it significant that more men took shop classes in high school and were referred to their first job by a friend or family member. It simply does not matter, however, why requiring applicants to find their own first job selects men at a disproportionate rate--unless the reason is also a job-related requirement. In this case, neither prior training nor a journeyman relative are required. Indeed, if, for example, the JATC did require apprentice applicants to have taken high school shop classes, and if substantially fewer women than men satisfied this condition, the requirement would violate Title VII unless the requirement distinguished those who are competent to become carpenters from those who are not.
 Because the JATC mischaracterized Eldredge's complaint, its experts' conclusions as to the causes of hiring differentials, even forgiving the obvious error of excluding a necessary population from the study, simply have no bearing on the issues in this case.
 
 
 [7]
 The data for 1976 through 1984 are as follows:
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 Analyzed year-by-year, assuming that applicants from prior years remain in the applicant pool, the data shows that women's indenture rate fluctuated between 16.09% and 64.03% of the men's rate. If it is assumed that there was no carryover of applicants from prior years, in seven of the years, women were indentured at between 17.21% and 73.34% of the male rate; in one year, the rate was 85.46% and in another 147.27%. The parties dispute whether a year-by-year analysis is necessary in this case. Although Eldredge did such an analysis, and the results demonstrate a substantial discriminatory impact for all years if a carryover is assumed and for seven of nine years with no carryover, she argues that the aggregated data alone may be relied on to prove her case. We agree. The aggregated data presents a more complete and reliable picture of the effects of the JATC's admission practices. See Lilly v. Harris-Teeter Supermarket, 720 F.2d 326, 336 n. 17 (4th Cir.1983), cert. denied, 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 539 (1984). Of course, if a year-by-year analysis demonstrated an ever-decreasing discriminatory impact, such a result should not be ignored. In this case, however, women did less well relative to men in the last two years for which data is available than they did over the nine year period as aggregated. Where, as here, "policies have remained unchanged over a period of time and there have been no substantial changes in the conditions determining their application, it would be unreasonable to require a plaintiff to break his or her data into year by year subgroups." D. Baldus & J. Cole, Statistical Proof of Discrimination Sec. 7.1 (1986 Supp.). Accordingly, we find that the aggregated data are the most probative and are certainly sufficient in this case.
 
 
 [8]
 Eldredge's statistician, Dr. Kakigi, using a binomial model, found that for the data aggregated over nine years, there was less than one chance in ten to the eighty-third power that the disparity in indenture rates resulted from chance (12.49 standard deviations). This astronomical result, however, may be inaccurate. The overall indenture rate was .38, and use of a binomial model "when the overall selection rate is too large, e.g., more than .20, can lead to results which are substantially misleading and inaccurate." D. Baldus & J. Cole, supra note 7, Sec. 9.0 (1986 Supp.)
 The JATC's statistician, Dr. Thomas, found that there was one chance in fifty (.02) that the disparity resulted from chance using a matched T test and once chance in twenty-two (.045) using a sign test. These results are probably too conservative. Based on Dr. Thomas's declaration, it is clear that he did not evaluate the data as aggregated over the nine years at issue. We have determined that the aggregated data is the most probative in this case. See supra note 7.
 Furthermore, it appears that Dr. Thomas's model rejected the assumption that male and female applicants had the same probability of becoming indentured. Dr. Thomas thought it significant that, among people within the carpentry trade, more men than women were referred to their first job by a friend or family member, and that, in high school, women were less interested in carpentry than were men. It would seem that Dr. Thomas's analysis was designed to test whether factors other than gender discrimination on the part of employers accounted for women being less successful at obtaining jobs. For the purposes of Eldredge's prima facie case, however, the issue is not why the "hunting license" system has a discriminatory impact, rather the issue is simply whether it has such an impact. To the extent that Dr. Thomas injected considerations other than the disparity in indenture rates into his model and analysis, his results would underestimate the level of statistical significance. The fact that Dr. Thomas used a matching test indicates that he broke the data down into subgroups in order to control for variables. See D. Baldus & J. Cole, supra note 7, Sec. 7.0-7.2 (1980 & 1986 Supp.). In general, "the plaintiff should not be required to disaggregate the data into subgroups which are smaller than the groups which may be presumed to have been similarly situated and affected by common policies." Id. Sec. 7.1 (1986 Supp.). Here, there simply are no subgroups. All applicants, male and female, meet the age and education requirements for admission into the program and should thus be presumed to have an equal chance to be indentured.
 It thus appears that neither statistician accurately tested the level of statistical significance--Dr. Kakigi's figures are too high and Dr. Thomas's are too low. However, even Dr. Thomas's lowest figure, once chance in twenty-two (.045) is sufficient to give rise to an inference that the "hunting license" system rather than chance is responsible for women's lower indenture rates. See Segar v. Smith, 738 F.2d 1249, 1283 (D.C.Cir.1984) (holding that the .05 level of significance is "certainly sufficient to support an inference of discrimination"), cert. denied, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985).
 
 
 [9]
 Eldredge argues that the JATC's practice of permitting indentured apprentices to remain in the program if they become unemployed belies the claim that the first-job requirement is a business necessity
 
 
 [10]
 While ordinarily we would require plaintiffs to show that the alternate method would be both effective and nondiscriminatory, we do not think that such proof is essential here. The alternate method is an established procedure set forth in the collective bargaining agreement. Since plaintiffs, the injured parties, are willing to accept the contractually established alternate method, we think it fair to presume that it will be utilized in an effective and nondiscriminatory manner
 As we previously held in this case:
 JATC may not avoid its own liability for practices illegal under Title VII by relying on the employers' possible future conduct that might frustrate the remedial purpose of any court-ordered changes in the apprenticeship program....
 ... There is no evidence [that the employers would refuse to hire women admitted to the apprentice program pursuant to any judgment that may be entered against JATC in this suit.] On the contrary, the employers have previously participated, apparently successfully, in a state-mandated affirmative action program designed to increase the number of minority apprentices.
 Eldredge v. 46 N. Cal. Counties Joint Apprenticeship and Training Committee, 662 F.2d 534, 537 (9th Cir.1981).
 
 
 [11]
 See Atonio, 827 F.2d at 442 ("Business necessity means more than a business purpose.")
 
 
 [12]
 Eldredge suggests that the first-job requirement could be eliminated, and qualified applicants indentured on a first-come-first-served basis. Indentured apprentices are eligible for job referrals through the union hiring hall. If the first-job requirement were retained, Eldredge suggested that the alternative method of numerical referrals from the new applicant referral list would serve the purpose of limiting the number of admittees and at the same time cure the discriminatory impact of the "hunting license" system